UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BEAUTIFUL SAVIOR LUTHERAN CHURCH OF VANCOUVER, WASHINGTON,<br><br>Plaintiff,<br><br>v.<br><br>BROTHERHOOD MUTUAL INSURANCE COMPANY,<br><br>Defendant. | CASE NO. 3:25-cv-05309-TL<br><br>ORDER ON MOTION FOR SUMMARY JUDGMENT |

This matter is before the Court on Plaintiff Beautiful Savior Lutheran Church's ("Beautiful Savior") motion for partial summary judgment (Dkt. No. 19). Having reviewed the motion, Defendant Brotherhood Mutual Insurance Company's ("Brotherhood") response (Dkt. No. 22), Plaintiff Beautiful Savior's reply (Dkt. No. 23), and the relevant record, and finding oral argument unnecessary, *see* LCR 7(b)(4), the Court DENIES the motion.

# I. BACKGROUND

## A. Parties

Plaintiff Beautiful Savior owns a church building located at 12513 Southeast Mill Plain Boulevard in Vancouver, Washington. *See* Dkt. No. 1 (Complaint) ¶ 7; Dkt. No. 8 (Answer) ¶ 7. Defendant Brotherhood is an insurance provider incorporated and headquartered in Indiana. Dkt. No. 1 ¶ 3; Dkt. No. 8 ¶ 3. During the time period relevant to this case, Defendant was Plaintiff's insurer, having issued Plaintiff a "MinistryFirst Commercial Multi-Peril Insurance Coverage" Policy (the "Policy") that was effective between June 6, 2022, and June 6, 2025. Dkt. No. 1 ¶ 8; Dkt. No. 8 ¶ 8.

## B. The Insurance Policy[1]

The Court provides herein the language from the Policy that is relevant to this motion.

### 1. "All-Risk" Coverage

The Policy states:

> 1. **Coverage –** "We" cover direct physical loss caused by a covered peril to:
>
>    a. "your" property[.]
>
> * * *
>
> **PERILS COVERED**
>
> When Special Perils is shown on the **declarations, we** cover risks of direct physical loss unless the loss is limited or caused by a peril that is excluded.

Dkt. No. 21-4 (Policy) at 88, 173. In the Policy's declarations, the Church building is listed as

[1] To minimize the use of brackets, this Order includes verbatim excerpts from the Policy. In the Policy, the terms "we," "us," and "our" refer to Defendant; "you" and "your" refer to Plaintiff. *See, e.g.*, Dkt. No. 21-4 (Policy) at 173.

covered property. *Id.* at 11. Under the "Peril Type" header, the declaration lists "Special with Theft." *Id.* Under Washington law, this type of insurance is considered an "all-risk policy," which means that the Policy "basically covers everything unless specifically excluded." *Seattle Tunnel Partners v. Great Lakes Reinsurance (UK) PLC*, 200 Wn.2d 315, 330, 516 P.3d 796 (2022) (quoting *Vision One, LLC v. Phila. Indem. Ins. Co.*, 174 Wn.2d 501, 307, 276 P.3d 300 (2012)). The Washington Supreme Court has elaborated, "That means the number of possibilities for . . . 'but for' causes of damage are limited only by the imagination of the reader." *Id.* (quoting *Vision One*, 174 Wn.2d at 307–08).

**2. Exclusions**

The Policy contains relevant exclusions that limit coverage:

> **2.** **We** do not pay for loss if one or more of the following exclusions apply to the loss[:]
>
> * * *
>
> c. **Contamination or Deterioration: We** do not cover loss caused directly or indirectly by contamination or deterioration including corrosion, decay, fungus, mildew, mold, rot, rust or any quality, fault, or weakness in property that causes it to damage or destroy itself. This exclusion does not apply to any resulting loss caused by a **specified peril** or breakage of building glass.
>
> * * *
>
> e. **Defects, Errors, and Omissions: We** do not cover loss which results from one or more of the following;
>
> 1) An act, error, or omission (negligent or not) relating to:
>
> a) land use;
>
> b) the design, specification, construction, workmanship, installation, or maintenance of property;

c) planning, zoning, development, siting, surveying, grading, or compaction; or

d) maintenance of property (including land, structures, or improvements);

whether on or off the described premises;

2) a defect, a weakness, the inadequacy, a fault, or unsoundness in materials used in construction or repair, whether on or off the described premises;

3) the cost to make good an error it design; or

4) a data processing error or omission in programming or giving improper instructions.

In addition, **we** do not cover loss to any kind of personal property caused by deficiency or defects in design, specifications, materials, or workmanship, or caused by latent or inherent defects.

**We** cover any resulting loss caused by a covered peril unless the resulting loss itself is excluded.

Dkt. No. 21-4 at 90.

**3. "Interior of Buildings Limitation"**

"The Policy limits coverage for loss to the 'interior of buildings[.]'" Dkt. No. 19 at 10.

> **Interior of Buildings: We** do not cover loss to the interior of buildings or structures or to personal property in the buildings or structures caused by rain, snow, sleet, ice, sand, or dust, unless:
>
> a. entering through openings made by a **specified peril**; or
>
> b. the loss is caused by the thawing of snow, sleet, or ice on the building or structure.

Dkt. No. 21-4 at 92.

An endorsement to the Policy, however, "adds back this coverage[.]" Dkt. No. 19 at 10.

> **Interior Building Damage:** When Special Perils Part (BCP-85) applies, **we** cover, up to the **limit** shown on the schedule above, sudden and accidental direct loss to the interior of buildings or to personal property in the buildings caused by rain, snow, ice, sleet, sand or dust.

Dkt. No. 21-4 at 141. As discussed above, the Policy includes the "Special Perils Part." *See id.* at 87–93. And although the limit is not provided in the schedule referenced by the endorsement, the Policy provides elsewhere that "Interior Building Damage Coverage" is limited to $1,000,000. *Id.* at 15.

**C. The Loss**

In their respective motion practice, the Parties provide a detailed narrative about the loss from which this case arose. The Parties are in substantial agreement about what happened. *Compare* Dkt. No. 19 at 11–13, *with* Dkt. No. 22 at 6–8.

In a nutshell, the underlying issue is an event where water penetrated within the church's roofing structure. In April 2024, Plaintiff hired a contractor to replace the roof of its church building. *See* Dkt. No. 21-3 at 2 (Wetherholt Report). While the project was underway, a "rain event" led to "water ent[ry] into the building." *Id.* The roofing subcontractor did not adequately remediate this, and upon completion of the project, water became "trapped within the roof assembly[.]" *Id.* at 5. Further, the new roof structure was "poorly installed[,] which led to water entry during and following [its] installation." *Id.*[2]

Plaintiff filed a casualty claim with Defendant, and Defendant investigated the cause and extent of the water's intrusion. Defendant obtained two expert reports, one from Wetherholt and Associates (*see* Dkt. No. 21-3 at 1–18 (Wetherholt Report)), and another from Talbott Associates, Inc. ("TAI") (*see* Dkt. No. 21-3 at 19–33 (TAI Report)). The Wetherholt Report

---

[2] Although "[t]he loss from the April rainstorm also included loss to the interior of the building, . . . [t]hat loss is not the subject of this motion." Dkt. No. 19 at 13.

concluded that "water entry that occurred in January of 2024 . . . appears to be as a direct result of poor workmanship on the part of the installing contractor which was evident due to the reported continued water entry following roof replacement." Dkt. No. 21-3 at 5. The TAI Report echoed this finding: "Post [roof structure]-installation water intrusion . . . was caused by poor workmanship in the construction of the [roof structure]." Dkt. No. 21-3 at 20.

On January 16, 2025, Defendant denied the claim, asserting that two exclusions—"Contamination or Deterioration" and "Defects, Errors, and Omissions"—precluded coverage. Dkt. No. 21-1 at 2 (denial letter). On January 30, 2025, Plaintiff filed an Insurance Fair Conduct Act ("IFCA") claim with the Washington Office of the Insurance Commissioner. Dkt. No. 21-2 at 7–10 (IFCA letter and cover sheet). Plaintiff alleged that Defendant's denial of the claim was unreasonable and, further, alleged several regulatory violations. *See id.* at 8–9. On February 25, 2025, Defendant responded to the administrative complaint. Dkt. No. 21-2 at 1–3 (IFCA response).

On April 11, 2025, Plaintiff filed a civil action against Defendant. Dkt. No. 1. In its Complaint, Plaintiff pleads five causes of action: breach of contract, bad faith, negligence, violation of the Washington Consumer Protection Act ("CPA"), and violation of IFCA. *Id.* ¶¶ 32–71. On September 24, 2025, Plaintiff filed the instant motion for partial summary judgment, on its breach-of-contract claim. Dkt. No. 19.

## II. LEGAL STANDARD

The Federal Rules of Civil Procedure "mandate[] the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). The inquiry at the summary judgment stage is "whether the

evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251–52 (1986).

The party moving for summary judgment must carry its burden of production by "either produc[ing] evidence negating an essential element of the nonmoving party's claim or defense or show[ing] that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). This showing must be made through evidence in the record. Fed. R. Civ. P. 56(c) (explaining the ways in which a "party asserting that a fact cannot be or is genuinely disputed must support the assertion"). Unless the burden of production is met, "the nonmoving party has no obligation to produce anything" to support its claims or defenses. *Nissan Fire*, 210 F.3d at 1103–04.

Courts do not make credibility determinations or weigh the evidence at this stage. *See Munden v. Stewart Title Guar. Co.*, 8 F.4th 1040, 1044 (9th Cir. 2021). They resolve factual issues in favor of a non-moving party, but "only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Conclusory, non-specific affidavits are insufficient, and "missing facts" are not to be presumed. *Id.* at 889. Further, uncorroborated and self-serving testimony does not create a genuine issue of fact. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).

## III. Discussion

### A. Preliminary Issues

The Court first addresses two issues raised in the Parties' respective briefing. First, the Court will define the scope of Plaintiff's motion. Second, the Court will address Defendant's

position on the propriety of summary judgment.

**1. Issues Under Consideration**

In its motion, Plaintiff asserts that it seeks summary judgment on its breach-of contract claim. Dkt. No. 19 at 4. Plaintiff specifically asserts its position on two issues: "(1) that [Plaintiff] suffered a '[d]irect physical loss' to its property that is not subject to its policy's sublimit for Interior Building Damage Coverage; and (2) that no exclusion applies to that loss." *Id.*

When responding to Plaintiff's motion, however, Defendant did not present any argument on the first issue. *See* Dkt. No. 22 at 9–12. Plaintiff argues that this omission represents a concession "that the roof assembly is not the 'interior' of the insured church, subject to the Policy's sublimit for Interior Building Damage Coverage." Dkt. No. 23 at 4. The Court agrees—to a degree. Certainly, by not contesting the issue, Defendant has *waived* it and forfeited its right to take a substantive position. *See Abogados v. AT&T, Inc.*, 223 F.3d 932, 937 (9th Cir. 2000). But this does not necessarily mean that Defendant has *conceded* it. *See* LCR 7(b)(2) ("*Except for motions for summary judgment*, if a party fails to file papers in opposition to a motion, such failure may be considered by the court as an admission that the motion has merit." (emphasis added)); *see also Wilson v. Rigby*, 909 F.3d 306, 319 (9th Cir. 2018) (Huck, J., dissenting) (defining concession as "accepting something as true or acknowledging defeat," whereas "[a] waiver, by contrast, is a voluntarily relinquishment of a right, claim, or privilege"). That is to say, Defendant's silence on the subject does not mean that Plaintiff's position is, by default, a meritorious one. The Court will therefore consider the issue, as one-sided as the argumentation might be.

**2. Summary Judgment**

Defendant argues that summary judgment is inappropriate here, because there is a triable

issue of fact that must be presented to a jury. *See* Dkt. No. 22 at 12–13. Defendant asserts that "there is conflicting evidence regarding whether the Church's replacement roof has actually suffered a direct physical loss within the meaning of the insuring agreement." *Id.* at 12–13. In response, Plaintiff argues that there is no conflicting evidence here, because "[t]he Parties rely on the *same* evidence." Dkt. No. 23 at 15. "The only dispute," Plaintiff asserts, "is how the terms of the policy apply to the undisputed facts, which is a question of law." *Id.*

The Court agrees with Plaintiff. The flaw in Defendant's position is hidden in plain sight. Defendant frames the conflict as one over "the *meaning* of the insuring agreement." Dkt. No. 22 at 13 (emphasis added). Construing the "meaning" of an insurance policy is a question of law, not fact. *See, e.g.*, *Wright v. Safeco Ins. Co. of Am.*, 124 Wn. App. 263, 271, 109 P.3d 1 (2004) ("Interpretation of an insurance policy is a question of law."). In such cases, courts "determine coverage by 'characterizing the perils contributing to the loss, and determining which perils the policy covers and which it excludes.'" *Id.* (quoting *Bowers v. Farmers Ins. Exch.*, 99 Wn. App. 41, 44, 991 P.2d 734 (2000)). Here, there is no dispute regarding "the [alleged] perils contributing to the loss." The Parties agree on, for example, how much water entered the structure, and when, and where the water came from. Indeed, they rely on the same two expert reports (both commissioned by Defendant) to explain what happened here, and how. And "determining which perils the policy covers and which it excludes" is purely a matter of contract interpretation which, under longstanding Washington law, is a duty assigned to the judge, not the jury. *See, e.g.*, *Downs Farmers' Warehouse Ass'n v. Pioneer Mut. Ins. Ass'n*, 41 Wash. 372, 378, 83 P. 423 (1906) ("There was no question for the jury. It was simply the duty of the court to apply the law to undisputed facts.").

**B. Interior Damage**

With respect to any rain damage to the interior of the church building, the Policy first

excludes such loss (*see* Dkt. No. 21-4 at 92), then adds it back via an endorsement (*see id.* at 141), but only up to the $1,000,000 "Interior Building Damage Coverage" limit (*id.* at 15). The question here is whether "[w]ater trapped within 'the roof assembly'" could represent damage to the "interior" of the building. Dkt. No. 19 at 14. On this issue, the Court finds that the Policy is ambiguous, because its language, "on its face, it is fairly susceptible to two different but reasonable interpretations." *Seattle Tunnel Partners*, 200 Wn.2d at 321.

On the one hand is Plaintiff's interpretation. Relying on the "'plain, ordinary, and popular' meaning" of the word "interior," as given in "standard English dictionaries," *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 877, 784 P.2d 507 (1990), Plaintiff argues that "the area between layers of roofing material is not 'within' or 'the internal part of a thing.'" Dkt. No. 19 at 14 (citing *Webster's Third New Int'l Dictionary* at 1179 (1993)). Rather, Plaintiff asserts that "it *is* the 'thing' that has an 'internal or inner part.'" *Id.* Plaintiff's conception of the church building is that it is like a banana: There is an interior, edible fruit (or pulp), and an exterior, inedible peel; the fruit is not the peel, and the peel is not the fruit. Similarly, there is the "interior" of the church building—the fruit—and the roofing structure that covers it—the peel. Where the relevant location is "between layers of roofing material," it is definitively peel and, consequently, not part of the interior.

On the other hand is the notion—which Plaintiff's dictionary definition accommodates—that there exists an infinitely thin division between the church building and the outside world, with everything on the church side of the division representing the building's "interior," and everything on the outside representing its "exterior." In this conception, the inner layers of the roofing structure are "the internal part of the thing," because they are on the church side of the division.

Fortunately, Washington law provides a solution to this puzzle. When interpreting

insurance contracts, "ambiguous policy language generally will be construed against the insurer and in favor of coverage." *Webb v. USAA Cas. Ins. Co.*, 12 Wn. App. 2d 433, 446, 457 P.3d 1258 (2020) (citing *Kut Suen Lui v. Essex Ins. Co.*, 185 Wn.2d 703, 712, 375 P.3d 596 (2016)). The "rule applies with added force to exclusions limiting coverage." *City of Bremerton v. Harbor Ins. Co.*, 92 Wn. App. 17, 22, 963 P.2d 194 (1998). Especially given that Defendant has not provided its own interpretation of the policy, the Court must choose the construction that points toward coverage and away from exclusion. The Court concludes that damage sustained to the roofing structure is not "loss to the interior of [the] building[]," Dkt. No. 21-4 at 141. Therefore, such damage is not subject to the $1,000,000 coverage limit.

**C. "Defects, Errors, and Omissions" Exclusion**

The Policy excludes coverage from "loss which results from . . . [a]n act, error, or omission (negligent or not) relating to . . . b) the design, specification, construction, workmanship, installation, or maintenance of property[.]" Dkt. No. 21-4 at 90. However, under what is known as a "resulting loss exception," the Policy "cover[s] any resulting loss caused by a covered peril unless the resulting loss itself is excluded." *Id.* "Under Washington law, resulting loss exceptions preserve coverage for covered losses when an exclusion would have otherwise removed it. . . . Resulting loss clauses preserve coverage for loss that ensues after an excluded event if it would otherwise be covered by the policy." *Gardens Condo. v. Farmers Ins. Exch.*, 2 Wn.3d 832, 839–40, 544 P.3d 499 (2024).

The issue here is how to characterize Plaintiff's loss. Plaintiff relies on *Gardens Condominium*, a recent Washington Supreme Court case involving an all-risk insurance policy, a faulty-workmanship exclusion, a resulting loss exception, and water intrusion within a building's roofing structure. *See* Dkt. No. 19 at 19 ("*Gardens Condominium* is dispositive."); *Gardens Condo.*, 2 Wn.3d at 835–36. In *Gardens Condominium*, "In late 2002, Gardens found damage to

the condominium building that was caused by faulty design and construction of the building's roof." 2 Wn.3d at 836. Between 2003 and 2004, Gardens redesigned and repaired the roof assembly "to increase ventilation and eliminate condensation[.]" *Id.* But in 2019, Gardens found water damage within the roof. *See id.* The re-designed roof "did not allow for sufficient ventilation[, and] . . . exposure to water vapor and condensation damaged the sheathing, fireboard, and joists." *Id.* at 836–37. Gardens sought coverage for the repair costs from its insurer. *See id.* at 837. The insurer denied the claim under the faulty-workmanship exclusion in Gardens' policy, concluding that "faulty construction 'initiated a sequence of events resulting in the loss or damage[.]'" *Id.* Gardens sued, arguing that "because the policy ordinarily covered [hidden water damage], the resulting loss exception to the faulty workmanship exclusion preserved . . . coverage even though the loss resulted from faulty workmanship." *Id.* The insurer argued that "the resulting loss exception d[id] not apply to natural consequences of an excluded peril"—e.g., faulty workmanship—"and, relatedly, that condensation is not a new peril because it is the 'natural and unavoidable byproduct of the faulty lack of ventilation.'" *Id.* at 843. The court disagreed and ruled in favor of Gardens, holding that "a resulting loss exception must have effect to preserve coverage for loss resulting from covered perils regardless of whether the peril is the natural consequence of an excluded peril." *Id.* at 844.

But *Gardens Condominium* is distinguishable from the instant case. In *Gardens Condominium*, the roofing structure had actually sustained water damage. *See id.* at 836–37. Some 15 years had elapsed between the faulty construction and the discovery of the problem, and the roofing structure had sustained 15 years' worth of water damage. *See id.* That is to say, between the peril of defective design and construction and the loss of water damage, a second peril—water—interceded. The *Gardens Condominium* court consistently described the condition of the roofing structure as "damaged," and the "roof sheathing and framing" as having needed to

have been repaired due to damage "caused by water vapor, condensation, and humidity." *Id.* at 837. Here, in contrast, the water intrusion *is* the purported damage. *See* Dkt. No. 19 at 14 ("This water intrusion is 'direct physical loss.'"). There is no interceding peril between the faulty workmanship and the water intrusion. Plaintiff describes "water trapped within the roof assembly" and "[e]levated moisture readings" (*id.* at 12), but no other damage—no mold, for example, or mildew, decay, or rot. Indeed, one expert report advised that the water-intrusion problem would be remedied if "the roof assembly [were] allowed to dry out." Dkt. No. 21-3 at 26. The same report found that the roof assembly's "[p]lywood sheathing should be evaluated but [that] initial findings would indicate that it would not need wholesale replacement." *Id.* The other expert report noted that "the existing plywood sheathing does not appear to be damaged and is in a serviceable state." *Id.* at 5.[3]

Plaintiff argues that "this Court has found 'water intrusion' to be a distinct 'covered peril' under all-risk policies, like the Policy." Dkt. No. 23 at 9 (citing *Sixty-01 Ass'n of Apt. Owners v. Pub. Serv. Ins. Co.*, No. C22-1373, 2023 WL 5152666, at *4 (W.D. Wash. Aug. 10, 2023); *Churchill v. Factory Mut. Ins. Co.*, 234 F. Supp. 2d 1182, 1191 (W.D. Wash. 2002); *Eagle Harbour Condo. Ass'n v. Allstate Ins. Co.*, No. C15-5312, 2017 WL 1316936, at *4 (W.D. Wash. Apr. 10, 2017)). This is true. But it is also not relevant to the issue of loss. Plaintiff conflates cause and effect. Peril *causes* loss; it is not necessarily[4] the loss itself. The respective

[3] Plaintiff argues that the satisfactory condition of the plywood sheathing does not mean that the roof was not damaged, because "[t]he 'plywood sheathing' is only one [of four] component[s] of the roofing assembly." Dkt. No. 23 at 10. But Plaintiff does not assert that any of the other three components sustained damage, and Plaintiff does not provide any evidence of such damage.

[4] The Court notes that the Washington Supreme Court has opined that "'[m]any events can be characterized as both a loss and a peril,' and distinguishing between them will at times constitute 'a semantic distinction without a difference.'" *Sprague v. Safeco Ins. of Am.*, 174 Wn.2d 524, 529, 276 P.3d 1270 (2012) (quoting *Vision One, LLC v. Phila. Indem. Ins. Co.*, 174 Wn.2d 501, 517–18, 276 P.3d 300 (2012)). But Plaintiff has not made such an argument here, and the Court finds that, as discussed above, under the circumstances presented here, there is both a distinction and a difference between the relevant peril and loss.

holdings in the cases cited by Plaintiff indicate as much. In *Sixty-01*, the loss was "extensive hidden water damage." *Sixty-01 Ass'n*, 2023 WL 5152666, at *1. In *Churchill,* the loss was "mold and water intrusion damage" *Churchill*, 234 F. Supp. 2d at 1185. And in *Eagle Harbour*, the loss was "deterioration and decay." *Eagle Harbour*, 2017 WL 1316936, at *1. In contrast here, Plaintiff asks the Court to consider the mere presence of water—but not any attendant damage—as a loss.

Moreover, even if the Court considers "water intrusion" to be a loss in and of itself, the Court agrees with Defendant that such loss is excluded under the Defects, Errors, and Omission Exclusion. It is undisputed that Plaintiff's roofing sub-contractor did a substandard job on the April 2024 re-roofing project. As concluded in the expert reports: "Post TPO-installation water intrusion continued and was caused by poor workmanship in the construction of the TPO roof covering" (Dkt. No. 21-3 at 20); and "Water trapped within the roof assembly . . . appears to be . . . a direct result of poor workmanship on the part of the installing contractor" (Dkt. No. 21-3 at 5). What is more, one expert advised that "[a]ny damage subsequent to the roof replacement project, or claims of damage to the installed roof system, should be directed at the roofing subcontractor that installed the roof, and/or at the prime contractor who subbed the roof replacement out to the subcontractor." *Id.* In other words, poor workmanship was the but-for cause of the water intrusion.

Importantly, because the water, beyond its inconvenient presence, did not cause further damage to the premises, it did not cause any *resulting* loss. "[A] resulting loss exception requires separate ensuing loss—damage beyond the faultily constructed or defectively designed element—caused by a new and distinct covered peril." *Gardens Condo.*, 2 Wn.3d at 842. As the Washington Supreme Court explained in *Sprague v. Safeco Insurance Company of America*, a resulting loss exception "breaks the causal chain between the excluded risk *and losses caused by*

*the excluded peril* in order to provide coverage for *the subsequent losses*." 174 Wn.2d 524, 529, 276 P.3d 1270 (2012) (emphasis added). In *Sprague*, which concerned a decking system "in a state of imminent collapse due to impairment of the structural integrity of the system," *id.* at 527, the court found that the rickety condition of the deck was, in fact, the loss, and that such condition "was the result of the excluded perils of defective workmanship and rot and did not constitute a separate loss apart from those perils," *id.* at 529. "If there had been [other] losses[, such as] an injury to a person hurt by the collapse *or property damaged by the deck failure*[,] coverage would have existed under the ensuing loss provisions of the policy." *Id.* at 530 (emphasis added). Similarly here, to the extent that the presence of water within the roofing assembly is the loss, that loss was the result of defective workmanship.

This conclusion is further supported by the following finding in the TAI Report:

> 4. Per <u>The NRCA Roofing Manual: Membrane Roof Systems,</u> Chapter 9.2, before reroofing, the roof surface condition should be evaluated including moisture presence in the membrane. "Confirmed areas of moisture must be removed prior to new roof application and replaced using compatible materials". Generally, when an old worn membrane with suspect moisture is present, it is stripped before the new membrane is installed. An evaluation of the old membrane, membrane moisture content and moisture within the plywood to assure dry conditions should have been done by the reroofing contractor. The decision whether to strip or cover over the old membrane would have been made by the insured after consultation with the roofer. Moisture intrusion during the April rainstorm should have prevented further roof closure until dry out.

Dkt. No. 21-3 at 25. That is to say, the remedy for the loss was simply to re-do the job properly, an action that would have included "[a]n evaluation of the old membrane, membrane moisture content and moisture within the plywood to assure dry conditions," then "further roof closure [after] dry out." *Id.* "[I]ncreased costs of completion . . . to repair faulty workmanship" is a telltale indication that the loss at issue was caused by a construction defect. *Wolstein v. Yorkshire Ins. Co., Ltd.*, 97 Wn. App. 201, 213, 985 P.2d 400 (1999). Had the intrusive water actually

caused damage to the church building—and there is no evidence that it did—and had such damage required more than a do-over on construction, then such losses would be covered under the resulting loss exception.

Therefore, the Court concludes that the loss at issue, having been caused by defective construction, is excluded from coverage under the Policy.

### D. "Contamination or Deterioration" Exclusion

Because the Court finds that the loss is excluded by the Defects, Errors, and Omissions Exclusion, it need not determine whether the Contamination or Deterioration Exclusion also applies.

## IV. Conclusion

Therefore, Plaintiff's motion for partial summary judgment (Dkt. No. 19) is DENIED.

Dated this 21st day of September 2026.

Tana Lin
United States District Judge